UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Melissa Claire Gilleon,<br><br>                              Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin, Acting Commissioner<br>of Social Security,<br><br>                              Defendant. | Case No.:  15cv2325-BEN-BGS<br><br>**REPORT AND<br>RECOMMENDATION** |

## I.    PROCEDURAL BACKGROUND

Melissa Claire Gilleon ("Plaintiff") filed an application for disability insurance benefits on March 28, 2012, alleging disability commencing on January 25, 2010.  (ECF No. 12, Administrative Record "AR" at 65, 188-189.)  Her claim was originally denied on June 26, 2012 (*id.* at 64-77) and upon reconsideration on December 10, 2012.  (*Id.* at 78-91.)  After a hearing on October 21, 2013, (*id.* at 28-57) and a supplemental hearing on January 13, 2014 (*id.* at 58-63), Administrative Law Judge ("ALJ") James P. Nguyen issued a decision denying the application on February 18, 2014.  (*Id.* at 10-27.)

On July 21, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision.  (*Id.* at 7-9.)  This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g), 1383(c).  Plaintiff filed her Motion for

1

Summary Judgment on May 13, 2016.  (ECF No. 16.)  In her motion for summary judgment, Plaintiff submits, for the first time, a Veterans Affairs ("VA") letter dated April 26, 2016, which reverses its prior determination and finds Plaintiff seventy percent disabled.  (ECF No. 16-2.)  Plaintiff argues that this reversal by the VA constitutes new evidence that should be considered on remand.[1]  (ECF No. 16-1 at 4.)  Plaintiff also argues that the ALJ's rejection of a treating physician's opinion was not supported by substantial evidence.  (*Id.* at 6.)  Defendant filed her cross Motion for Summary Judgment on July 11, 2016.  (ECF No. 21-1.)  Plaintiff filed a reply on July 25, 2016.  (ECF No. 23.)  Defendant filed a reply on August 1, 2016.  (ECF No. 24.)

## II.  LEGAL STANDARD FOR DETERMINATION OF A DISABILITY

In order to qualify for disability benefits, an applicant must show that: (1) he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than twelve months; and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A).  An applicant must meet both requirements to be "disabled."  *Id.* The applicant has the burden to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

The Secretary of the Social Security Administration set forth a five-step sequential evaluation process for determining whether a person has established his or her eligibility for disability benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The five steps in the process are as follows:

---

[1] Plaintiff's Motion for Remand and/or Summary Judgment attached a letter from the Department of Veterans Affairs.  This letter references a "Rating Decision" which purportedly provides a detailed explanation of the VA's decision, the evidence considered, and the reasons for the decision.  (ECF No. 16-2 at 2.)  However, Plaintiff did not attach the Rating Decision.  The Court ordered Plaintiff to supplement the record with the Rating Decision on August 3, 2016.  (ECF No. 25.)  Plaintiff did so on August 5, 2016.  (ECF No. 26.)

1.  Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is not disabled within the meaning of the Social Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2.  Is the claimant's impairment severe?  If so, proceed to step three.  If not, then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520C, 416.920C.

3.  Does the impairment "meet or equal" one or more of the specific impairments described in 20 C.F.R. Pt. 404, Subpt. P, App. 1?  If so, then the claimant is disabled.  If not, proceed to step four.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4.  Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled.  If not, proceed to step five.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5.  Is the claimant able to do any other work?  If so, then the claimant is not disabled.  If not, then the claimant is disabled.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof during steps one through four.  *Id.* at 953.  The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience."  *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999); *see also* 20 C.F.R. § 404.1566 (describing "work which exists in the national economy").  If the Commissioner fails to meet this burden, then the claimant is disabled.  If, however, the Commissioner proves that the claimant is able to perform other work that exists in significant numbers in the national economy, then the claimant is not disabled.  *Bustamante*, 262 F.3d at 953-54.

## III.   MEDICAL RECORDS AND EVALUATIONS PRE-HEARING

The Court has synthesized Plaintiff's medical records for the purpose of providing

context to its analysis of the issues.  This summary, however, does not purport to be exhaustive of every detail contained in the administrative record.  Specifically, Plaintiff's medical record contains a number of documents related to a laparoscopic hysterectomy (AR 530-66, 602, 715-20) and an incisional ventral hernia.  (*Id.* at 608-12, 615-16, 619-24, 708, 711-14).  Although the ALJ considered these records (*id.* at 15-16), they are not the source of any dispute between the parties.  As a result, those records are not included in this section, but are mentioned in section IV(C), which summarizes the ALJ's decision.

## A. Treatment Records from 2011

Dimitri Perivoliotis, Ph.D., Psychologist authored a Psychology Initial Evaluation Note regarding Plaintiff on December 9, 2011.  (*Id.* at 387.)  This report states that Plaintiff presented with Major Depressive Episodes & Mania.  (*Id.* at 383.)  Notes on this diagnosis state that Dr. Willward was steadily increasing her dose of antidepressants "with good benefit." (*Id.*)  The notes state that Plaintiff has "lingering sx of guilt (about poor decisions regarding financial investments – 2 failed businesses), worthlessness (about failed marriage), and impaired concentration. Possible past MDEs secondary to losing businesses and severe marital discord with ex-husband." (*Id.*)  Plaintiff was presented with Posttraumatic Stress Disorder, describing "chronic sx of re-experiencing (intense distress around male doctors and men in general) . . ., anxiety when in VA hospital (I found her pacing a hallway next to the waiting room); physiological reactivity in presence of triggers; avoidance (avoiding thoughts, triggers, detachment from men); and increased arousal (impaired concentration).  Also was victim of domestic violence by husband, who blamed her for the MST." (*Id.* at 383-84.)

Plaintiff also presented with Obsessive-Compulsive Disorder, specifically the compulsive behavior of dermatillomania wherein she "picks her hands and face, sometimes to the point of bleeding and scarring, as a method to maintain concentration (denies that she uses it to alleviate distress).  She wore gloves to the interview to prevent picking but took them off.  There were minimal signs of the picking on her hands/face." (*Id.* at 384.)  Plaintiff also reported being preoccupied with cleanliness.  (*Id.*)  Plaintiff

"denied any feared consequences if she does not complete the compulsive behaviors and they do not appear to be motivated by fear . . . Behaviors do not appear to be highly rigid or ritualized and do not cause distress." (*Id.*)

Plaintiff also presented with Attention-Deficit Disorder. (*Id.*) Plaintiff reported chronic hyperactivity, and impulsivity. (*Id.*) Notes state that neither symptom appear to be due to mania. (*Id.*) She also has equivocal complaints of inattention but it is noted that she graduated college with a BS in biology with "average" grades and became a dental hygienist. (*Id.*)

The following diagnostic impressions were listed:

Axis I: Posttraumatic Stress Disorder, Major Depressive Disorder, recurrent, moderate; r/o Obsessive Compulsive Disorder; r/o Attention-Deficit Hyperactivity Disorder Not Otherwise Specified; Axis II: Deferred; Axis III: Arrhythmia (see chart); Axis IV: Inadequate social support, unemployment; Axis V: Global Assessment of Functioning, current = 60.

(*Id.* at 386-87)

### B. Treatment Records from 2012

Carolyn B. Allard, Ph.D. clinical psychologist, supervised a MST Clinic Intake Evaluation of Plaintiff conducted by Sage Schuitevoerder, Ph.D., Clinical Research Therapist, on January 4, 2012. (*Id.* at 377.) Notes from this evaluation state, in part: "Pt. stated that she tends to have difficulty motivating herself to engage in pleasant activities. 'There are things that make me happy. I force myself to do those things.' Patient endorsed feeling disconnected from others and has a limited social network." (*Id.* at 379.) With respect to physiological arousal it states, "Patient endorsed difficulty concentrating. She denied irritability or anger outbursts. Pt. stated that when triggered, she feels on guard, wary of others, her mouth gets dry, hearts (sic) races, has trouble breathing." (*Id.*) Notes from this evaluation also state that:

[Plaintiff] endorsed symptoms consistent with Major Depression such as: lethargy, overeating, feeling guilty, difficulty concentrating, and feeling

restless/fidgety.  No thoughts of suicide.

Patient stated that she sometimes picks at her skin to the point of bleeding. Patient was wearing gloves during the interview to avoid engaging in this behavior.  Patient also stated that she tends to excessively focus on cleanliness; however will 'force' herself not to clean or vacuum for days at a time.

(*Id.*)

Dr. Allard noted the following diagnoses: Axis I: Posttraumatic Stress Disorder, Chronic (MST); Major Depressive Disorder, recurrent, moderate r/o Obsessive Compulsive Disorder; Axis II: Deferred; Axis III: Arrhythmia (see chart); Axis IV: Inadequate social support, unemployment; Axis V: Global Assessment of Functioning, current = 60.  (*Id.* at 381)

Plaintiff attended CPT group therapy on January 24, 2012 with therapists Sheeva Mostoufi and Cassidy A. Gutner, M.A.  (*Id.* at 376.)  Plaintiff contributed personal information and was attentive during discussions.  (*Id.*)  Plaintiff's mood was "euthymic."  (*Id.*)  Plaintiff's assessment states "progressing as expected" and "continues to be impaired."  (*Id.*)

Plaintiff attended CPT group therapy on January 31, 2012 with therapists Sheeva Mostoufi and Cassidy A. Gutner, M.A.  (*Id.* at 374)  Plaintiff contributed personal information and was attentive during discussions.  (*Id.*)  Plaintiff's mood was "euthymic."  (*Id.*)  Plaintiff's assessment states "progressing as expected" and "continues to be impaired." (*Id.* at 375.)

Plaintiff attended CPT group therapy on February 7, 2012 with therapists Sheeva Mostoufi and Cassidy A. Gutner, M.A.  (*Id.* at 371.)  Plaintiff contributed personal information and was verbal during discussions.  (*Id.* at 373.)  Plaintiff's mood was "euthymic."  (*Id.*)  Plaintiff's assessment states "progressing as expected."  (*Id.*)

Plaintiff attended CPT group therapy on February 14, 2012 with therapists Sheeva

Mostoufi and Cassidy A. Gutner, M.A.  (*Id.* at 371.)  Plaintiff contributed personal information and was verbal during discussions.  (*Id.*)  Plaintiff's mood was "euthymic." (*Id.*)  Plaintiff's assessment states "progressing as expected" and "continues to be impaired."  (*Id.* at 372.)

Plaintiff attended CPT group therapy on February 21, 2012 with therapists Sheeva Mostoufi and Cassidy A. Gutner, M.A..  (*Id.* at 369.)  Plaintiff contributed personal information and was verbal during discussions.  (*Id.* at 370.)  Plaintiff's mood was "euthymic."  (*Id.*)  Plaintiff's assessment states "continues to be impaired."  (*Id.*)

Also on February 21, 2012 Cassidy Gutner, M.A. entered a note regarding Plaintiff's "Comprehensive Mental Health Treatment Plan."  (*Id.* at 368.)  This entry was signed by Carolyn B. Allard, Clinical Psychologist.  (*Id.* at 369.)  Ms. Gutner diagnosed Plaintiff with the following: Axis I: Posttraumatic Stress Disorder; Major Depressive Disorder, recurrent, moderate; Axis II: Deferred; Axis III: Arrhythmia; Axis IV: Inadequate social support, unemployment; Axis V: Global Assessment of Functioning, current = 60.  (*Id.* at 368.)  Ms. Gutner noted the following "problems" regarding Plaintiff's PTSD: "decrease re-experiencing symptoms.  Increase interest in hobbies and social activities.  Specify: Veteran reports being isolated as a result of her symptoms and would like to go out more often.  Decrease feelings of attachment.  Improve concentration."  (*Id.*)

Plaintiff attended CPT group therapy on February 28, 2012 with therapists Sheeva Mostoufi and Cassidy A. Gutner, M.A.  (*Id.*)  Plaintiff contributed personal information and was verbal during discussions.  (*Id.* at 367.)  Plaintiff's mood was "euthymic."  (*Id.*) Plaintiff's assessment states "progressing as expected."  (*Id.*)

Plaintiff attended CPT group therapy on March 6, 2012 with therapists Sheeva Mostoufi and Cassidy A. Gutner, M.A.  (*Id.* at 365)  Plaintiff contributed personal information and was verbal during discussions.  (*Id.* at 366.)  Plaintiff's mood was "euthymic."  (*Id.*)  Plaintiff's assessment states "progressing as expected."  (*Id.*)

Plaintiff attended CPT group therapy on March 13, 2012 with therapists Sheeva

Mostoufi and Cassidy A. Gutner, M.A.  (*Id.* at 363)  Plaintiff contributed personal information and was verbal during discussions.  (*Id.* at 364.)  Plaintiff's mood was "euthymic."  (*Id.*)  Plaintiff's assessment states "progressing as expected."  (*Id.*)

Plaintiff attended CPT group therapy on March 20, 2012 with therapists Sheeva Mostoufi and Cassidy A. Gutner, M.A.  (*Id.*)  Plaintiff contributed personal information. (*Id.* at 362.)  Plaintiff's mood was "euthymic."  (*Id.*)  Plaintiff's assessment states "progressing as expected."  (*Id.* at 361.)

Plaintiff attended CPT group therapy on March 27, 2012 with therapists Sheeva Mostoufi and Cassidy A. Gutner, M.A.  (*Id.* at 360)  Plaintiff contributed personal information and was verbal during discussions.  (*Id.*)  Plaintiff's mood was "euthymic." (359.)  Plaintiff's assessment states "progressing as expected."  (*Id.* at 361.)

Plaintiff attended Cognitive Processing Therapy ("CPT") group therapy on April 10, 2012 with therapists Sheeva Mostoufi and Cassidy A. Gutner, M.A.  April 10, 2012. (*Id.* at 359.)  Plaintiff contributed personal information and was verbal during discussions.  (*Id.*)  Plaintiff's mood was "euthymic."  (*Id.*)  Plaintiff's assessment states "progressing as expected."  (*Id.*)

Dr. Barbara Perry wrote a Psychiatry Outpatient Note regarding Plaintiff on May 8, 2012, which states that Plaintiff has "PTSD, depression, MST, R/O ADHD, OCD." (*Id.* at 355.)  The note further states that Plaintiff "improved with bupropion 150 gam, then levelled off, buspar 20 tid helpful for anxiety, psych testing c/w PTSD rather than ADHD although family hx of ADHD, now in granddaughter wiht(sic) blindness, plan to increase Ritalin.  Walk in am helpful, sertraline switch to am vs. pm."  (*Id.*)  During a "Mental Status Examination," Dr. Parry noted that Plaintiff was "calm, cooperative [and] pleasant."  (*Id.* at 357.)  Plaintiff reportedly stated her mood was "okay."  (*Id.*)

Dr. Barbara Perry wrote a Psychiatry Outpatient Note regarding Plaintiff on December 18, 2012, which states that Plaintiff "[s]till [has] some residual depression. Will increase buproprion to 450mg qam, cont sertraline 200mg."  (*Id.* at 677.)  The note further states that Plaintiff's "mood [was] slightly depressed, affect congruent with mood.

Denied suicidal and homicidal thoughts during the interview and in recent past.  Denies delusions and hallucinations at the present time.  Cognitive skills, including memory functions and concentration grossly intact.  Insight and judgment not impaired." (*Id.* at 678)  Dr. Parry provided the following assessment of Plaintiff: Axis I: PTSD, Axis II: n/a; Axis III: sleep apnea, cardiac arrhythmia, Axis IV, granddaughter's illness, Axis V: 80. (*Id.*)

### C. Treatment Records from 2013

Dr. Barbara Perry wrote a treatment note regarding Plaintiff on April 23, 2013, which states that Plaintiff

> improved with bupropion 150 qam, then levelled off, buspar 20 tid helpful for anxiety, psych testing c/w PTSD rather than ADHD although family hx of ADHD, now in granddaughter wiht(sic) blindness, plan to increase Ritalin.  Walk in am helpful, sertraline switch to am vs. pm.  Buprorion increase to 300mg associated with much improvement, bupirone not that helpful but wishes to maintain, switch to sertraline in the am improved sleep.  Getting w/u for sleep apnea and arrhythmia.

(*Id.* at 617.)  Dr. Parry's Mental Status Examination notes state that Plaintiff was

> [a]lert, fully oriented and cooperative.  Speech normal in rate and rhythm, thought process coherent, and goal directed.  Mood euthymic, affect congruent with mood.  Denies suicidal ideation and homicidal thoughts during the interview and in recent past.  Denies delusions and hallucinations at the present time.  Cognitive skills, including memory functions and concentration, grossly intact.  Insight and judgment not impaired.

(*Id.* at 618.)  Dr. Parry provided the following assessment: Axis I: PTSD; Axis II: n/a; Axis III: sleep apnea, cardiac arrhythmia; Axis IV: granddaughter's illness; Axis V: 80.  (*Id.* at 618-19)

Dr. Barbara Perry wrote a Psychiatry Outpatient Note regarding Plaintiff on July 23, 2013.  (*Id.* at 704.)  Dr. Parry's Mental Status Examination notes state that

Plaintiff was

> [a]lert, fully oriented and cooperative.  Speech normal in rate and rhythm, thought process coherent, and goal directed.  Mood stressed, affect congruent with mood.  Denies suicidal and homicidal thoughts during the interview and in recent past.  Denies delusions and hallucinations at the present time.  Cognitive skills, including memory functions and concentration, grossly intact.  Insight and judgment not impaired.

(*Id.* at 705).  Dr. Parry provided the following assessment: Axis I: PTSD; Axis II: n/a; Axis III: sleep apnea, cardiac arrhythmia; Axis IV: granddaughter's illness; Axis V: 80.  (*Id.*)

Dr. Barbara Perry wrote a Psychiatry Outpatient Note regarding Plaintiff on October 1, 2013.  (*Id.* at 699.)  Dr. Parry's Mental Status Examination notes state that Plaintiff was

> [a]lert, fully oriented and cooperative.  Speech normal in rate and rhythm, thought process coherent, and goal directed.  Mood euthymic, affect congruent with mood.  Denies suicidal ideation and homicidal thoughts during the interview and in recent past.  Denies delusions and hallucinations at the present time.  Cognitive skills, including memory functions and concentration, grossly intact.  Insight and judgment not impaired.

(*Id.* at 698-99).  Dr. Parry noted the following assessment: Axis I: PTSD, MST; Axis II: n/a; Axis III: sleep apnea, cardiac arrhythmia, s/p hysterectomy, oophoriectomy (sic), abdominal hernia; Axis IV: granddaughter's illness, denial of benefits, son with TBI; Axis V: 80.  (*Id.* at 699.)

Dr. Barbara Perry wrote a Psychiatry Outpatient Note regarding Plaintiff on October 15, 2013.  (AR 695.)  The note states, in part,

> Will increase bupropion to 450mg qam, cont. sertraline 200 mg.  Only uses alprazolam rarely for anxiety, not buspar . . . 9 yo granddaughter hurt in go-cart accident at camp, she took her to Children's hospital (vs. camp

counselors), doing OK but with(sic) PTSD ("Post-Traumatic Stress
Disorder"), pt upset that camp left decision up to child . . . Requests
Trazadone for sleep as Benadryl not helpful.  Alprazolam uses minimally for
stress during day, not sleep.

(*Id.*)  Dr. Parry's Mental Status Examination notes state that Plaintiff was
[a]lert, fully oriented and cooperative.  Speech normal in rate and rhythm,
thought process coherent, and goal directed.  Mood euthymic, affect
congruent with mood.  Denies suicidal ideation and homicidal thoughts
during the interview and in recent past.  Denies delusions and hallucinations
at the present time.  Cognitive skills, including memory functions and
concentration, grossly intact.  Insight and judgment not impaired.

(*Id.* at 696.)  Dr. Parry noted the following assessment: Axis I: PTSD, MST; Axis
II: n/a; Axis III: sleep apnea, cardiac arrhythmia, s/p hysterectomy, oophoriectomy
(sic), abdominal hernia; Axis IV: granddaughter's illness, denial of benefits, son
with TBI; Axis V: 80.  (*Id.* at 697.)

### D. Medical Opinion Evidence

#### 1. Dr. Parry's Mental Residual Functional Capacity Assessment

In support of her disability application, Plaintiff submitted a Mental Residual
Functional Capacity Assessment completed by Dr. Barbara Parry.  (*Id.* at 441-42.)  Dr.
Parry opined that Plaintiff has moderate limitations in her ability to: (1) Understand and
remember very short and simple instructions; (2) Carry out very short and simple
instructions; (3) Make simple work-related decisions; (4) Ask simple questions or request
assistance; (5) Maintain socially appropriate behavior and to adhere to basic standard of
neatness and cleanliness; (6) Be aware of normal hazards and take appropriate
precautions.  (*Id.* at 441-42.)

Dr. Parry further stated that Plaintiff has marked limitations in her ability to: (1)
Remember locations and work like procedures; (2) Understand and remember detailed
instructions; (3) Carry out detailed instructions; (4) Maintain attention and concentration

for extended periods; (5) Perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (6) Sustain an ordinary routine without special supervision; (7) Work in coordination with or proximity to others without being distracted by them; (8) Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (9) Interact appropriately with the general public; (10) Accept instructions and respond appropriately to criticism from supervisors; (11) Get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (12) Respond appropriately to changes in the work setting; (13) Travel in unfamiliar places or use public transportation; (14) Set realist goals or make plans independently of others.  (*Id.* at 441-42.)

Dr. Parry added the following handwritten statement: "Ms. Gilleon suffers from Post-Traumatic Stress Disorder and Major Depression as a result of military sexual trauma.  Despite her active participation in psychological, behavioral and pharmacological treatment, she continues to have significant limitations in understanding and memory, in sustained concentration and persistence, social interaction and adaptation."  (*Id.* at 443.)

### 2.  VA Disability Evaluation by Dr. Cara Eggers

Dr. Eggers completed an evaluation of Plaintiff for VA disability benefits on June 11, 2013.  (*Id.* at 602.)  Dr. Eggers reported that, based on her revaluation, Plaintiff had a diagnosis of PTSD that conforms to the DSM-IV criteria.  (*Id.* at 588.)  Dr. Eggers characterized the diagnosis as "chronic, mild."  (*Id.*)  Dr. Eggers' notes state that Plaintiff's "Depression is well-controlled with meds . . . No current diagnosis of depression."  (*Id.* at 589.)  With respect to panic attacks, Dr. Eggers writes, "The Veteran describes panic attacks when exposed to trauma-reminders; no separate diagnosis of Panic Disorder is warranted."  (*Id.*)  Dr. Eggers states that Plaintiff's insomnia is accounted for by her PTSD.  (*Id.*)  Dr. Eggers concludes that she "do[es] not find this

Veteran is unemployable due to PTSD symptoms.  Last GAF[2] score by her treating

psychiatrist (Dr. Parry) was 80; sees Dr. Parry every few months."  (*Id.* at 589-90.)  Dr.

Eggers gave Plaintiff a GAF score of 70, noting "GAF 70 is for mild impairments in

social and occupational functioning related to PTSD."  (*Id.* at 590.)

Dr. Eggers assessed that Plaintiff had "occupational and social impairment due to

mild or transient symptoms which decrease work efficiency and ability to perform

occupational tasks only during period of significant stress, . . . symptoms controlled by

medication."  (*Id.* at 592.)

Dr. Eggers wrote the following for Plaintiff's relevant mental health history:

The Veteran states she requested mental health services in the military but

was not provided with it.  She then started psychotherapy about 20 years ago

with a private practitioner through Tricare.  Also went through some marital

counseling.  Started psychotherapy in the San Diego VA in 2011; see intake

---

[2] The Global Assessment of Functioning (GAF) score is a scale reflecting "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000). The GAF scale ranges from 1 to 100 and is used by clinicians to indicate his or her overall judgment of a person's psychological, social, and occupational functioning on a scale devised by the American Psychiatric Association. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders (Text Revision, 4th ed. 2000) (DSM-IV-TR).  A GAF of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work, school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family and is unable to work[.])."  A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Id.*  A GAF of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*  It should be noted that the Ninth Circuit has observed that "[t]he Commissioner has determined the GAF scale "does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings."  65 Fed. Reg. 50, 746, 50, 765 (Aug. 21, 2000)."  *McFarland v. Astrue*, 288 Fed.Appx. 357, 359 (9th Cir. 2008)(unpub.).  In fact, GAF scoring has been removed from the DSM V for "lack of conceptual clarity."  *Phillips v. Colvin*, 61 F.Supp.3d 925, 931 n.2 (N.D. Cal. 2014).

note dated 12-9-11.  Currently by Dr. Parry, and is prescribed Wellbutrin, sertraline, Xanax. Last seen my Dr. Parry, psychiatrist with the following diagnosis:

Assessment: Axis I: PTSD; Axis II: n/a; Axis II: sleep apnea, cardiac arrhythmia; Axis IV: granddaughter's illness; Axis V: 80

(*Id.* at 595.)

Dr. Eggers recounted a "stressor" that Plaintiff "described as traumatic" which involved a sexual assault during her time in the Navy.  (*Id.* at 596-97.)  Dr. Eggers then identified the following diagnostic criteria for PTSD, referred to as Criteria A-F, from the *Diagnostic and Statistical Manual of Mental Disorders*, 4th Edition:

Criterion A: (1) The Veteran has been exposed to a traumatic event where both of the following were present: the Veteran experienced, witnessed or was confronted with an event that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others.  (2) The Veteran's response involved intense fear, helplessness or horror.  (*Id.* at 589)

Criterion B: The traumatic event is persistently re-experienced in 1 or more of the following ways: (1) recurrent and distressing recollections of the event including images, thoughts or perceptions; (2) recurrent distressing dreams of the event; (3) intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event; (4) Physiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event.  (*Id.* at 589.)

Criterion C: Persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (not present before the trauma), as indicated by three or more of the following: (1) Efforts to avoid thoughts, feelings or conversations associated with the trauma; (2) Efforts to avoid activities, places or people that arouse recollections of the trauma; (3) feeling of detachment or estrangement from others.  (*Id.* at 589-99.)

Criterion D: Persistent symptoms of increased arousal, not present before the

trauma, as indicated by two or more of the following: (1) Difficulty falling or staying asleep; (2) hyper vigilance; (3) Exaggerated startle response.  (*Id.* at 599.)

Criterion E: The duration of the symptoms described above in Criteria B, C and D is more than 1 month.  (*Id.*)

Criterion F: The PTSD symptoms described above cause clinically significant distress or impairment in social, occupational, or other important areas of functioning. (*Id.*)

Dr. Eggers indicated the following symptoms that applied to Plaintiff's diagnosis: anxiety, chronic sleep impairment, flattened affect, difficulty in establishing and maintaining effective work and social relationships, difficulty in adapting to stressful circumstances, including work or a work like setting.  (*Id.* at 600.)

Dr. Eggers stated that it was her opinion that Plaintiff's "PTSD symptoms are at least as likely as not incurred in or caused by in-service events."  (*Id.* at 601.)

### 3.  Dr. Barry J. Broomberg, M.D.

Dr. Broomberg filled out a Supplemental Certification regarding Plaintiff's disability status on January 2, 2007, which stated that Plaintiff is disabled because of anxiety and depression.  (*Id.* at 336.)   Dr. Broomberg filled out a similar form on April 2, 2007 (*id.* at 333), May 8, 2007 (*id.* at 335), September 12, 2007 (i*d.* at 342), and October 12, 2007 each with the same diagnosis.  (*Id.* at 341.)

A Progress Note from Dr. Broomberg's office from July 22, 2010 states that Plaintiff was there to talk about her medication for Depression.  (*Id.* at 327.)

A Progress Note from Dr. Broomberg's office from December 7, 2011 states that Plaintiff was there to talk about her medication for her OCD.  (*Id.* at 326.)  Dr. Broomberg also filled out a "Claim for Disability Insurance Benefits – Doctor's Certificate" on December 7, 2011.  (*Id.* at 325.)  This form states that Plaintiff has been incapable of performing her regular or customary work starting on December 2, 2011. (*Id.*)  It states an anticipated date to return to work as June 2, 2012.  (*Id.*)  Dr. Broomberg lists as a diagnosis: Severe OCD, Depression and anxiety.  (*Id.*)

1

2      The record contains what appears to be a prescription form, dated March 20, 2012,

3  with letterhead from Barry J. Broomberg, M.D. which states: This patient is unable to

4  work any more [illegible] Severe P.T.S.D. Post Traumatic Stress Disorder.  (*Id.* at 323.)

5          **4.  Anna M. Franco, State Agency Medical Consultant**

6      State agency medical consultant Anna M. Franco, Psy.D. reviewed Plaintiff's

7  disability application on June 19, 2012.  (*Id.* at 64.)  Dr. Franco found that Plaintiff had

8  the following medically determinable impairments—anxiety disorders and affective

9  disorders.  (*Id.* at 69.)  In assessing Plaintiff's disability determination, Dr. Franco

10  considered Listing 12.04 for affective disorders and Listing 12.06 for anxiety disorders.

11  (*Id.* at 70.)  Dr. Franco found that Plaintiff's medically determinable impairments could

12  reasonably be expected to produce her pain or other symptoms.  (*Id.*)  However, Dr.

13  Franco found that Plaintiff's allegations were "partially credible" because the statements

14  were "credible to allegations but not to severity."  (*Id.* at 71.)  Dr. Franco relied on

15  Plaintiff's ADLs (activities of daily living), her medication treatment, and her intact

16  recent MSE (mental status examination) in determining that Plaintiff was "partially

17  credible."  (*Id.* at 70-71.)

18      Dr. Franco determined that Plaintiff did not have the Residual Functional Capacity

19  ("RFC") to perform past relevant work.  (*Id.* at 74.)  Based on her RFC, Dr. Franco stated

20  that Plaintiff demonstrates the maximum sustained work capability for heavy/very heavy

21  work.  (*Id.* at 75.)  Dr. Franco stated that Plaintiff had the following limitations:

22  understanding and memory, concentration and persistence, social interaction, and

23  adaptation.  (*Id.* at 71-73.) Specifically, Dr. Franco determined that Plaintiff was

24  moderately limited in the following areas: ability to understand and remember detailed

25  instructions, ability to carry out detailed instructions, ability to interact appropriately with

26  the general public, ability to respond appropriately to changes in the work setting.  (*Id.* at

27  71-73.)  Dr. Franco gave controlling weight to the VA MER [medical examiner report],

28  and determined that Plaintiff was capable of understanding, remembering, and carrying

out simple one to two step (unskilled) tasks.  (*Id.* at 68, 73.)  Plaintiff was able to maintain concentration, persistence, and pace through a normal workday/workweek as related to simple/unskilled tasks.  (*Id.* at 68, 70, 73.)  Dr. Franco suggested that Plaintiff have limited public contact, but she could otherwise interact and adapt accordingly with coworkers and supervisors.  (*Id.* at 70, 73.)

According to Dr. Franco's evaluation, Plaintiff was limited to unskilled work because of her impairments, but Plaintiff was capable of performing work that is less demanding.  (*Id.* at 75-76.)  Based on the documented findings, Dr. Franco found that Plaintiff was not disabled.  (*Id.* at 75.)

### 5. Peter Bradley, State Agency Medical Consultant

State agency medical consultant Peter Bradley, Ph.D. reviewed Plaintiff's disability application on December 5, 2012 as a reconsideration Mr. Franco's prior review.  (*Id.* at 84.)  Dr. Bradley stated that he reviewed the entire file and adopted the PRTF (Psychiatric Review Technique Form)/MRFC (Mental Residual Functional Capacity) proposed at the initial level.  (*Id.* at 82.)

## IV.   JANUARY 13, 2014 HEARING BEFORE THE ALJ[3]

### A. Plaintiff's Testimony

Plaintiff was born on March 14, 1958.  (*Id.* at 32.)  She lives alone.  (*Id.*)  Her granddaughter lived with her for three years, during which Plaintiff was the primary caretaker.  (*Id.*)  While Plaintiff was helping to care for her granddaughter, her son and daughter-in-law who lived down the street would also help with the child's care.  (*Id.*)  Last summer, Plaintiff's granddaughter injured herself at camp, and Plaintiff took her to the emergency room.  (*Id.* at 42-43.)  Plaintiff still has guardianship over her granddaughter, but does not live with her "on a full time basis."  (*Id.* at 48.)  She spends the night with Plaintiff about once a month.  (*Id.* at 49-50.)  Plaintiff's son sustained a

---

[3] Plaintiff also had a hearing before ALJ William K. Mueller on October 21, 2013.  (AR at 60.)  Before any testimony was given, ALJ Mueller recused himself from the case because he knew the Plaintiff.  (*Id.*)  The hearing was rescheduled before a different ALJ at that time.  (*Id.* at 61.)

traumatic brain injury and Plaintiff took care of him during his rehabilitation.  (*Id.* at 33.)
He also lived with Plaintiff during a period of time.  (*Id.*)

Plaintiff takes care of her personal hygiene.  (*Id.* at 34.)  She does not shop for herself; her sons or her daughter-in-law buy groceries for her.  (*Id.* at 34, 46-47.)  Her daughter-in-law helps with household chores as well.  (*Id.* at 34.)  Plaintiff is not able to do the chores because of her depression; she cannot get out of bed.  (*Id.*)  Plaintiff has a driver's license, but does not drive.  (*Id.*)  If she needs to get around, she has a friend drive her.  (*Id.* at 35.)  Plaintiff states that on an average day, she does nothing but watch television.  (*Id.* at 40.)  She does not socialize with people, but has a friend that calls her every day.  (*Id.*)  Plaintiff likes to read, but has problems with comprehension.  (*Id.* at 43.)  Sometimes she will forget she has read a book before.  (*Id.*)  Plaintiff never goes to the movies, church, or out to eat.  (*Id.* at 47.)  Plaintiff showers maybe once a week.  (*Id.*)

Plaintiff completed "some college" and then joined the Navy where she "went to dental school and dental hygiene."  (*Id.* at 35.)  She never worked as a dental hygienist because there was no place to take the exam after she got out of the military.  (*Id.*)  Plaintiff worked as an office manager for a dental office.  (*Id.* at 35-36.)  In that position, Plaintiff scheduled patients, answered the phone, and did billing.  (*Id.* at 36.)  Plaintiff stopped working in that job because her boss had a severe drug addiction, and would yell and throw things at her.  (*Id.* at 36-37.)  She left that job and went on disability for a year for depression.  (*Id.* at 38.)

After that, Plaintiff owned a candy shop in La Jolla, California from about 2008 to 2010.  (*Id.* at 35, 37.)  When she owned the candy shop, Plaintiff was responsible for hiring staff, and employed nine people.  (*Id.* at 37.)  Plaintiff stopped her work at the candy shop because "it was too much for [her.]"  (*Id.* at 38.)

Plaintiff does not think anything physical prevents her from work—it is her depression, panic attacks and OCD.  (*Id.* at 45.)  Plaintiff sees a therapist, Dr. Parry, every two weeks, sometimes more.  (*Id.* at 40.)  Plaintiff takes medication for anxiety, such as panic attacks, and to keep her from "basically being suicidal."  (*Id.* at 40-41.)

The medications have helped, and Plaintiff does not think about suicide anymore.  (*Id.* at 41.)  Without medication, Plaintiff's mental state is "terrible."  (*Id.*)  She goes through manic stages where she does a lot, like repainting a room five times, or she will feel exhausted and not get out of bed for days.  (*Id.*)  When Plaintiff is medicated, she still has episodes where she will feel like she can "conquer the world" and then she goes back to bed, but it is not as severe.  (*Id.*)  She does not know how often these episodes happen now, but she does not think she has had one in three or four months.  (*Id.* at 42.) She was in a manic state a couple of months ago, and she was in a depressive state all of last week.  (*Id.* at 46.)

### B. Vocational Expert's Testimony

Gloria Lasoff testified as the Vocational Expert ("VE").  (*Id.* at 51.)  The VE classified Plaintiff's prior job as an office manager as 219.362-010, which is an SVP: 4 and is light.  (*Id.* at 51-52.)  Plaintiff's job as a retail store manager is 185.167-046, which is an SVP: 7 and also light.  (*Id.* at 52.)  The ALJ posed the following hypothetical:

> [A]ssume a person of the claimant's age, education and work experience who has no exertional limitations.  She does have the following limitations: she can understand, remember and carry out job instructions; she can maintain attention and concentration to perform simple, routine and repetitive tasks; she can occasionally interact with coworkers and supervisors; and no direct interaction with the general public; and she can work in an environment with occasional changes to the work setting and occasional work related decision making.

(*Id.*)  The VE testified that Plaintiff's prior work would be "ruled out" with those limitations, but other jobs would be available.  (*Id.*)  One example would be a hand packager, 920.587-018, SVP: 2, medium, of which there are 600,000 jobs in the national economy.  (*Id.*)  Another example would be cleaner, sweeper, 389.683-010, SVP: 2, medium, of which there are 2,000,000 jobs in the national economy.  A third example is hospital cleaner, 323.687-010, SVP: 2, medium, of which there are 400,000 jobs in the

national economy.  (*Id.* at 52-53.)

The ALJ posed the following as a second hypothetical: "assume the same limitations of the previous one but now an individual would likely miss four or more days of work each month."  (*Id.* at 53.)  With that additional limitation, the VE testified that the three previously mentioned jobs would not be available, nor would any other work. (*Id.*)  The VE further testified that the typical tolerance level for absenteeism is "at the most" one day per month.  (*Id.*)

Plaintiff's attorney provided for the ALJ and VE a copy of the medical source statement from the treating psychotherapist at the VA, Dr. Barbara Parry, which the VE reviewed.  (*Id.* at 53-54.)  The ALJ asked the VE whether Plaintiff would be capable of any of her former work if she were limited to the degree found by Dr. Barbara Parry, to which the VE responded that she would not.  (*Id.* at 54.)  The VE also stated that Plaintiff would not be capable of any of the work identified in response to the ALJ's first hypothetical, nor would she be capable of sustaining gainful activity, at any level, competitively in the national environment.  (*Id.*)  The VE stated that her testimony was consistent with the *DOT* [Dictionary of Occupational Titles].  (*Id.* at 55.)

### C. ALJ's Findings

On February 18, 2014, the ALJ issued his decision denying Plaintiff's application for supplemental security income.  (*Id.* at 23.)  In reaching his decision, the ALJ applied the Commissioner's five-step sequential disability determination process set forth in 20 C.F.R. § 404.1520 and described above.  (*Id.* at 13-23.)

#### 1. Step One

The ALJ found that Plaintiff had not engaged in substantial gainful activity since January 25, 2010, the alleged onset date.  (*Id.* at 15.)

#### 2. Step Two

At step two, the ALJ found that Plaintiff had the following severe impairments: posttraumatic stress disorder (PTSD), major depressive disorder, and a history of obsessive-compulsive disorder (OCD).  (*Id.*)

### 3.  Step Three

At step three, the ALJ considered Plaintiff's medically determinable physical impairments under all the applicable listings and sections of the Listing of Impairments and found that they do not meet or medically equal the criteria of any medical listing, singly or in combination.  (*Id.* at 16.)  Specifically, the ALJ considered Listings 12.04 and 12.06.  (*Id.*)  The ALJ found that Plaintiff has mild restrictions in her activities of daily living.  (*Id.* at 17.)

In social functioning, the ALJ found Plaintiff has moderate difficulties.  (*Id.*)  The ALJ noted that certain medical records document Plaintiff's anxiety around and avoidance of men, as well as sleep disturbance, social isolation, and episodes of panic, secondary to a history of a sexual assault and domestic violence.  (*Id.*)  He also noted her ability to participate in an all-female therapy group, be the primary caretaker for her granddaughter, and her GAF scores of 60 and 80, all of which support a conclusion that her limitations in social functioning are not more than moderate.  (*Id.*)

With respect to concentration, persistence or pace, the ALJ found that Plaintiff has moderate difficulties.  (*Id.*)  The ALJ noted that Plaintiff asserted she had problems concentrating, following instructions, remembering, and occasional difficulty with reading comprehension.  (*Id.*)  However, the ALJ also noted that she reported being able to read for long periods of time without problems, pay bills, and manage her bank accounts.  (*Id.*)  Furthermore, the ALJ found that the mental status examination findings and Plaintiff's GAF scores support the conclusion that she has no more than moderate limitations in this area.  (*Id.*)

Because the ALJ found that Plaintiff's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, he concluded that the "paragraph B" criteria were not satisfied.  (*Id.*)  The ALJ also found that Plaintiff failed to establish the presence of "paragraph C" criteria of Listings 12.04 and 12.06.  (*Id.*)

///

### a. Residual Functional Capacity Determination

Before considering step four of the sequential evaluation process, the ALJ first determined Plaintiff's residual functional capacity.  (*Id.* at 14.)  The ALJ found that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: she can understand, remember, and carry out simple job instructions.  She can maintain attention and concentration to perform simple, routine and repetitive tasks.  She can have occasional interaction with coworkers and supervisors, and no direct interaction with the general public.  She can work in an environment with occasional changes to the work setting and occasional work-related decision-making.  (*Id.* at 17-18.)  In making this finding, the ALJ considered all symptoms and the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p.  The ALJ also considered opinion evidence.

In determining Plaintiff's residual functional capacity, the ALJ gave no weight to multiple statements from Barry J. Broomberg, M.D., who concluded that Plaintiff was unable to work due to her mental impairments.  (*Id.*)  The ALJ noted that such an opinion is reserved for the Commissioner, and such statements are not entitled to controlling weight.  (*Id.*)  The ALJ also highlighted that Dr. Broomberg's statements were, for the most part, completed to support Plaintiff's application for State disability benefits, "which suggests patient accommodation rather than objective opinion."  (*Id.*)  Moreover, none of the statements included supporting objective findings or identified specific functional limitations which prevent Plaintiff from working.  (*Id.*)

The ALJ gave no weight to the checkbox-type form completed by Dr. Parry, indicating marked limitations in fourteen out of twenty functional areas.  (*Id.*)  Although the ALJ acknowledged that the opinion of a treating physician is generally given more weight, the ALJ found that Dr. Parry's assessment of Plaintiff was "completely inconsistent" with her treatment notes, which document relatively minimal examination

findings and GAF scores of 60 and 80. (*Id.*) The ALJ concluded that such an extreme discrepancy "greatly reduces the probative value of Dr. Parry's opinion." (*Id.*)

The ALJ gave significant weight to the assessments by the State agency psychological consultants, Anna M. Franco Psy.D., and Peter Bradley, Ph.D., who both concluded that Plaintiff was capable of performing simple job tasks and had moderate limitations in social functioning and adaptation. (*Id.*) The ALJ found these determinations to be well supported by the objective and clinical evidence, including medication efficacy, the mostly unremarkable mental status examination findings, and the GAF scores. (*Id.* at 20-21.) The ALJ noted that these conclusions were also consistent with Dr. Eggers' conclusion that there was "no evidence [the claimant was] unemployable due to PTSD symptoms," which were "mild or transient." (*Id.* at 21 citing AR 589-90, 592.) The ALJ noted that, although Dr. Eggers' assessment is based on the criteria for VA disability determinations, an ALJ must ordinarily give great weight to a VA determination of disability in the Ninth Circuit. (*Id.* at 21 citing *McCartey v. Massanari*, 298 F.3d 1072 (9th Cir. 2002).

The ALJ also considered the third party function report completed by Sue Wilson, Plaintiff's friend of twenty years. (*Id.* at 21.) Ms. Wilson reported talking to Plaintiff on the phone daily, and visiting her home three to five times a week. (*Id.*) The ALJ found that Ms. Wilson's statements as to Plaintiff's symptoms and functional limitations were not fully supported by the objective medical evidence. (*Id.*) In determining Plaintiff's residual functional capacity, the ALJ considered the diagnoses, symptoms and functional limitations Ms. Wilson reported, but noted that, because she is a lay witness, her opinions on those issues are less probative than those of medical professionals. (*Id.*)

### b. Credibility Determination

After careful consideration of Plaintiff's testimony and statements of record, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. (*Id.* at 19.) However, the ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of those

symptoms were not fully credible.  (*Id.*)  In making this determination, the ALJ noted that Plaintiff was the primary caretaker of her young granddaughter for approximately three years, and still has her granddaughter overnight monthly, and remained the child's legal guardian.  (*Id.*)

The ALJ also found that inconsistent statements diminished Plaintiff's credibility.  (*Id.*)  For example, the ALJ noted that although Plaintiff testified that she relied on family to bring her groceries and maintain her household, she stated in her May 2012 functional report that she did laundry, cleaned and shopped for food weekly.  (*Id.*)  Also, in medical records dated June 2013, Plaintiff indicated that her depression was well controlled with medication, and her depression screening was negative.  (*Id.*)  However, Plaintiff testified during her hearing before the ALJ that she spent the entire two weeks prior to the hearing in bed due to depression.  (*Id.*)

Most importantly according to the ALJ, the objective medical evidence did not support Plaintiff's alleged symptom severity and functional limitations.  (*Id.*)  The ALJ reviewed and considered all of the admitted medical evidence, which included only occasional references to mental health symptoms or treatment.  (*Id.*)  The ALJ noted that Plaintiff began seeing Barbara L. Parry, M.D., a psychiatrist, on January 31, 2012.  (*Id.*)  Plaintiff saw Dr. Parry approximately every two months through December 2012, "with symptom improvement, generally unremarkable mental status examination findings, and GAF scores of 60 and 80 noted."  (*Id.*)  The ALJ also noted the evaluation by Cara Zuccarelli Eggers, Ph.D., in June 2013, where Plaintiff stated that her depression was well controlled with medication, and was diagnosed chronic, mild PTSD and assessed a GAF score of 70.  (*Id.*)

### 4. Step Four

Based on Plaintiff's documented vocational background, testimony, and earnings record, as well as the VE's pre-hearing analysis and testimony, Plaintiff has past relevant work as an office manager, *DOT* 219.362-010, and as a retail manager, *DOT* 185.167-046.  The VE testified that as generally performed pursuant to the *DOT* and as actually

performed by Plaintiff, these occupations are semi-skilled and skilled, respectively.  (*Id.*)
The ALJ concluded that, because Plaintiff is limited to unskilled work, she is unable to
perform her past relevant work.  (*Id.*)

### 5. Step Five

Plaintiff was born on March 14, 2958 and was fifty-one years old on the alleged
disability onset date.  (*Id.* at 22.)  Plaintiff has at least a high school education and is able
to communicate in English.  (*Id.*)  The ALJ also found that transferability of job skills is
not material to the determination of disability because using the Medical-Vocational
Rules as a framework supports a finding that Plaintiff is not disabled whether or not she
has transferable job skills.  (*Id.*)

Considering Plaintiff's age, education, work experience, and residual functional
capacity, the ALJ determined that there are jobs that exist in significant numbers in the
national economy that Plaintiff can perform.  (*Id.*)  The ALJ noted that Plaintiff's ability
to perform work at all exertional levels has been compromised by nonexertional
limitations.  (*Id.*)  To determine the extent to which those limitations erode the
occupational base of unskilled work at all exertional levels, the ALJ asked the VE
whether jobs exist in the national economy for an individual with Plaintiff's age,
education, work experience and residual functional capacity.  (*Id.*)  The VE testified that
given all of those factors, the individual would be able to perform the requirements of the
following representative occupations:

1. Hand packager, *DOT* 920.587-018, a medium, unskilled (SVP 2) occupation,
   with 600,000 such jobs in the national economy; and

2. Cleaner/sweeper, *DOT* 389.683-010, a medium, unskilled (SVP 2) occupation,
   with 2,000,000 such jobs in the national economy; and

3. Hospital cleaner, *DOT* 323.687-010, a medium, unskilled (SVP 2) occupation,
   with 400,000 such jobs in the national economy.

(*Id.*)  The ALJ determined that the VE's testimony was consistent with the information
contained in the *Dictionary of Occupational Titles* ("*DOT*").  (*Id.* at 23.)

Based on the testimony of the VE, the ALJ concluded that, considering Plaintiff's age, education, work experience and residual functional capacity, Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  (*Id.*)  The ALJ, therefore, found Plaintiff not disabled.  (*Id.*)

## V.   SCOPE OF REVIEW

Section 205(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of a final agency decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited.  *Id.*  This Court has jurisdiction to enter a judgment affirming, modifying, or reversing the Commissioner's decision.  *See id.*; 20 C.F.R. § 404.900(a)(5).  The matter may also be remanded to the Social Security Administration for further proceedings.  *Id.*

The Commissioner's decision must be affirmed upon review if it is: (1) supported by "substantial evidence" and (2) based on proper legal standards.  *Uklov v. Barnhart*, 420 F.3d 1002, 1004 (9th Cir. 2005).  If the Court, however, determines that the ALJ's findings are based on legal error or are not supported by substantial evidence, the Court may reject the findings and set aside the decision to deny benefits.  *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001).  Substantial evidence is more than a scintilla but less than a preponderance.  *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003).  It is "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion."  *Id.*; s*ee also Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (finding substantial evidence in the record despite the ALJ's failure to discuss every piece of evidence).  "Where evidence is susceptible to more than one rational interpretation," the ALJ's conclusion must be upheld.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts.  *See Lewis v. Apfel*, 236 F.3d 503, 509 (9th Cir. 2001).  This is because the ALJ has a "well-settled role as the judge of credibility."  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).  Accordingly, the

ALJ's assessment of a claimant's credibility and pain severity should be given "great weight." *Dominguez v. Colvin*, 927 F. Supp. 2d 846, 865 (9th Cir. 2003) (citing *Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1986)). Nevertheless, the Court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

## VI.   ANALYSIS: THE VA DISABILITY APPEAL ISSUE

### A. Plaintiff's Arguments

On April 26, 2016, Plaintiff received a decision of her disagreement from the VA, wherein the VA determined that her condition of PTSD was service connected and assessed Plaintiff with a 70% disability rating effective March 6, 2012. (ECF No. 16-1 at 4-5.) The VA also granted Plaintiff a 100% unemployability rating.[4] (*Id.* at 5.) Plaintiff argues that a Department of Veterans Affairs (VA) disability rating—issued after the ALJ's decision—constitutes new and material evidence requiring a remand for a hearing before the ALJ. *See Hoa Hong Van v. Barnhart*, 483 F.3d 600, 605 (9th Cir. 2007). In support of her position, Plaintiff cites to a letter from the Department of Veterans Affairs overturning her prior disability determination and awarding her "100% rate due to Individual Unmployability[.]" (ECF No. 16-2 at 2.)

Plaintiff argues that her case should be remanded for further proceedings to review the new evidence of her VA disability rating, which was not available at the time of the ALJ's decision. (*Id.*) In the alternative, Plaintiff argues that she is entitled to summary judgment on this basis. (*Id.*)

### B. Defendant's Arguments

Defendant argues that this case should not be remanded because Plaintiff's VA disability rating was not based on any additional information not previously considered

---

[4] Dr. Eggers completed an evaluation of Plaintiff for VA disability benefits on June 11, 2013, wherein she determined that Plaintiff did not qualify for disability benefits. (*Id.* at 602.) Plaintiff appealed this decision. Three years later, on April 26, 2016, Plaintiff received a decision of her appeal from the VA, which granted her disability benefits and characterized her as 100% unemployable due to her disability status. (*See* ECF No. 16-2.)

by the ALJ.[5]  (ECF No. 21-1 at 5.)  According to Defendant, because the VA and the ALJ reviewed the same evidence, and reached different conclusions, the fact that the VA changed its decision is not sufficient to show that the ALJ would reach a different conclusion upon remand, as is required.  (*Id.* at 8.)

## C. Relevant Law

42 U.S.C. § 405(g) states, "[t]he court may, on motion of the Commissioner of Social Security made for good cause shown . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  New evidence is material when it "'bear[s] directly and substantially on the matter in dispute,' and if there is a 'reasonabl[e] possibility that the new evidence would have changed the outcome of the . . . determination.'"  *Bruton v. Massanari*, 268 F.3d 824, 827 (9th Cir. 2001) (alterations and omission in original) (quoting *Booz v. Sec'y of Health & Human Servs.*, 734 F.2d 1378, 1380 (9th Cir. 1984)).

## D. Analysis

The letter from the Department of Veterans Affairs that Plaintiff cited references a Rating Decision, which is said to "provide[] a detailed explanation of [the VA's] decision, the evidence considered, and the reasons for [the VA's] decision."  (*Id.*)  No such Rating Decision is attached to Plaintiff's exhibit.[6]  As a result, the Court cannot conclude from this letter (ECF No. 16-2) alone whether or not the decision by the VA was based on new or different evidence than what was before the ALJ when he issued his

---

[5] The Court notes that the record is not clear whether or not the VA's decision was based on new evidence.

[6] The Court requested supplementation of the record by Plaintiff, specifically requesting this Rating Decision.  (ECF No. 25.)  On August 5, 2016, Plaintiff filed a Supplementation of the Record as Per Court Order, attaching the original exhibit in ECF No. 16-2, a declaration from Plaintiff's attorney, and a declaration from Plaintiff.  (*See* ECF No. 26.)  This filing did not include the rating decision or any information regarding what, if any, new evidence the VA relied on in changing its disability determination.

decision.

Defendant's argument that the VA's decision is based on the same information before the ALJ does not comport with the record.  The Court agrees that, if it were known that the VA did not review any additional evidence in changing their disability determination, the case should not be remanded and Plaintiff's motion for remand and/or summary judgment should be denied.  Such was the case in *DeOcampo v. Comm'r of Soc. Sec.*, 552 F. App'x 726, 727 (9th Cir. 2014).  There, as here, the plaintiff received a favorable disability rating by the VA after the ALJ issued his opinion.  *Id.*  The Ninth Circuit noted that the plaintiff "conceded that the VA's decision was based on the same medical information presented to the ALJ, and he is bound by those concessions."  (*Id.* citing *Reynoso v. Giurbino*, 462 F.3d 1099, 1110 (9th Cir. 2006).  Here, however, Plaintiff makes no such concession, and the record before the Court is unclear.

This uncertainty in the record makes this case more akin to the Ninth Circuit decision, *Luna v. Astrue*, 623 F.3d 1032 (9th Cir. 2010).  There, the plaintiff received two different disability decisions by the social security administration.  *Id.* at 1035.  The Court stated:

> We cannot conclude based on the record before us whether the decisions concerning Luna were reconcilable or inconsistent . . . she may have presented different medical evidence to support the two applications, or there might be some other reason to explain the change.  Given this uncertainty, remand for further factual proceedings was an appropriate remedy.

*Id.* citing *Am. Bird Conservancy v. FCC*, 545 F.3d 1190, 1195 n. 3 (9th Cir. 2008)("The proper remedy for an inadequate record . . . is to remand to the agency for further factfinding.")

As in *Luna*, the record is unclear whether the VA relied on different evidence to overturn its decision to award Plaintiff disability benefits, or whether there is another explanation for the change.  Where the record is inadequate, the Ninth Circuit directs us

to remand the case to the agency for further factfinding.  As a result, the Court **RECOMMENDS** this case be remanded for further proceedings so the Commissioner can determine whether the VA decision was based on new evidence, and if so, whether that evidence would influence the ALJ's disability determination.

## VII.   ALJ'S CONSIDERATION OF TREATING SOURCE OPINION

### A. Plaintiff's Argument

Plaintiff argues that the ALJ erred in giving no weight to Dr. Parry, Plaintiff's treating physician.  (ECF No. 16-1.)

### B. Defendant's Argument

Defendant acknowledges that treating physicians are generally afforded greater weight when evaluating medical opinion evidence.  (ECF No. 21-1 at 8.)  However, Defendant argues, the opinions of treating physicians are not conclusive, especially if they are brief, conclusory and inadequately supported by the clinical evidence.  (*Id.*) According to Defendant, the ALJ permissibly gave no weight to the October 2013 check-box opinion of Dr. Parry because the ALJ found that her opinion was inconsistent with her treatment notes reporting unremarkable mental status examinations and mild and transient symptoms.  (*Id.* at 9-10.)

### C. Relevant Law

The Ninth Circuit distinguishes among the opinions of three types of physicians: (1) those who treat the claimant ("treating physicians"); (2) those who examine but do not treat the claimant ("examining physicians"); and (3) those who neither examine nor treat the claimant ("nonexamining physicians").  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  It is undisputed that Dr. Parry is a treating physician. (ECF No. 16-1, at 8.)

Social Security Ruling 96-2p mandates that if a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight.  Even if the treating source's opinion is not entitled to controlling weight, it is entitled to deference and must be weighed against all 20 C.F.R. 404.1527 factors.  Since opinions of treating doctors are entitled more

deference than the opinions of non-treating doctors, an ALJ must provide specific and legitimate reasons, supported by substantial evidence in the record, when the treating doctor's opinion will not be given controlling weight. *Lester*, 81 F.3d at 830. Although the treating physician's opinion is entitled to great deference, it is "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

The Ninth Circuit requires that an ALJ provide "clear and convincing" reasons to reject the opinion of a treating physician when that opinion is uncontradicted. *Lester*, 81 F.3d at 830-31. Where the opinion of the claimant's treating physician is contradicted, and the opinion of a non-treating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the non-treating source may itself be substantial evidence. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). "When there is conflicting medical evidence, the [Commissioner] must determine credibility and resolve the conflict." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). In addition, the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings. *Id*.

### D. Discussion

The ALJ gave Dr. Parry's "checkbox-style form" no weight, stating that "Dr. Parry's assessment is completely inconsistent with her treatments notes, which . . . document relatively minimal examination findings and GAF scores of 60 and 80. (AR at 20.) The ALJ concluded that "[s]uch an extreme discrepancy greatly reduces the probative value of Dr. Parry's opinion." (*Id.*)

In *Batson v. Comm'r of Soc. Sec. Admin.*, the Ninth Circuit upheld an ALJ's decision discounting the treating physician's view because it was in the form of a checklist, did not have supporting objective evidence, was contradicted by other statements and assessments of Plaintiff's medical condition, and was based on Plaintiff's subjective descriptions of pain. 359 F.3d 1190, 1195 (9th Cir. 2004). Similarly, Dr.

Parry opined in checklist format that Plaintiff was seriously limited in nearly every area of functioning, yet failed to explain how she reached her conclusions and did not include the medical or clinical findings to support her assessment.  (AR 441-43.)  Instead, Dr. Parry writes the following: "Ms. Gilleon suffers from Post-Traumatic Stress Disorder and Major Depression as a result of military sexual trauma.  Despite her active participation in psychological, behavioral and pharmacological treatment, she continues to have significant limitations in understanding and memory, in sustained concentration and persistence, social interaction and adaptation."[7]  (*Id.* at 443.)

Moreover, not only did the ALJ find that Dr. Parry's opinion was unsupported, he also found that it was in contradiction to *her own* treatment records regarding Plaintiff.  Specifically, the ALJ noted that Dr. Parry's treatment notes "document relatively minimal examination findings and GAF scores of 60 and 80."  (AR at 20.)  Thus, given that an ALJ may discredit a treating physician's opinions that are conclusory, brief, and unsupported by the record as a whole, it was not legal error for the ALJ to discount Dr. Parry's opinions in this case since they were in the form of a checklist, and unsupported by objective evidence from Dr. Parry herself.  *See also Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

## VIII.   ALJ'S CONSIDERATION OF NONEXAMINING OPINIONS

Plaintiff argues that the ALJ improperly afforded significant weight to the assessments of non-examining state agency physicians.  (ECF No. 16-1 at 12.)  Plaintiff also notes that the state agency examinations took place in 2012, and did not review any of the medical evidence submitted after.[8]  (*Id.* at 12-13.)

---

[7] The Court notes that the check-the-box form completed by Dr. Parry had four headings: understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  (AR at 441-442.)  This further supports the Court's conclusion that Dr. Parry's analysis was conclusory and lacked objective support.

[8] Plaintiff cites case law in support of her insinuation that an ALJ must rely on the most recent medical opinion available.  However, the cases Plaintiff cites in support of this proposition are inapposite.  For example, in *Stone v. Heckler*, the Ninth Circuit did admonish an ALJ for ignoring a more recent medical opinion, but only because the Plaintiff suffered from a neuropathic joint disease described as "a

Whereas the Defendant argues that the ALJ reasonably gave significant weight to the opinions of State agency psychological consultants Anna M. Franco, Psy. D., and Peter Bradley, Ph.D.  (*Id.* at 10.)

As mentioned above, the Ninth Circuit distinguishes among the opinions of three types of physicians: (1) those who treat the claimant ("treating physicians"); (2) those who examine but do not treat the claimant ("examining physicians"); and (3) those who neither examine nor treat the claimant ("nonexamining physicians").  *Lester*, 81 F.3d at 830.  It is undisputed that Ms. Franco and Dr. Bradley are State agency psychological consultants who examined the record, or nonexamining physicians.  (ECF No. 16-1 at 12; ECF No. 21-1 at 10.)

The Ninth Circuit has held that the opinion of a nonexamining physician cannot *by itself* constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 n. 4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (emphasis added).  However, giving the examining physician's opinion more weight than the nonexamining expert's opinion does not mean that the opinions of nonexamining sources and medical advisors are entitled to no weight.  *Andrews v.*, 53 F.3d at 1041.  Indeed, reports of consultative physicians called in by the Secretary may serve as substantial evidence supporting the ALJ's decision.  *Andrews*, 53 F.3d at 1041.

Importantly, the Court notes that the ALJ did not use the opinions of the state agency consultants to discount Dr. Parry's opinion, as Plaintiff seems to suggest.[9]

---

progressive destruction of the weight-bearing joints in the lower extremities."  *Stone v. Heckler*, 761 F.2d 530, 532 (9th Cir. 1985).  There is no indication from the record, nor does Plaintiff suggest, that she has any sort of progressive disease or condition such that *Stone* is instructive.  Moreover, the ALJ considered the entirety of the medical record in making his disability determination.  *See* section IV(C) for a detailed review of the evidence the ALJ considered.

[9] Notably, even if ALJ relied on the opinions of the agency consultants in discounting the opinion of Dr. Parry, this would not be error because it was not the *only* basis of the ALJ's decision.  The opinion of a non-examining physician cannot *by itself* constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.  *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (emphasis added).  In *Gallant*, the Ninth Circuit held that "the report of [a] non-

Instead, the ALJ afforded significant weight to the opinions of the State agency consultants in making his overall determination of Plaintiff's residual functional capacity. (*See id.* at 21.)  Specifically, the ALJ noted that "[b]oth concluded the claimant was capable of performing simple job tasks and had moderate limitations in social functioning and adaptation." (*Id.*)  The ALJ further found that those determinations were "well supported by the objective and clinical evidence of record, including the documented medication efficacy, the mostly unremarkable mental status examination findings, and the GAF scores." (*Id.* at 20-21.)  The ALJ also noted that these opinions were "consistent with Dr. Eggers' conclusion that there was 'no evidence [the claimant was] unemployable due to PTSD symptoms,' which were 'mild or transient.'" (*Id.* at 21.)

The ALJ's use of the nonexamining physician's opinions was not error because these opinions were not the only basis for the ALJ's determination of Plaintiff's residual functional capacity.  The ALJ relied not only on the opinions of the nonexamining physicians, but also his consideration of all of Plaintiff's symptoms, the objective medical evidence, and opinion evidence. (*Id.* at 18.)  The ALJ explained his analysis of claimant's testimony, wherein he "considered her statements of record, including those in several disability reports and a function report." (*Id.*)  All of this information relied on by the ALJ constitutes substantial evidence that supports his determination of Plaintiff's residual functional capacity.  As a result, the ALJ did not err in the weight he afforded to Ms. Franco, Psy.D. and Mr. Bradley, Ph.D.

---

treating, non-examining physician, combined with the ALJ's own observance of [the] claimant's demeanor at the hearing" did not constitute "substantial evidence" and, therefore, did not support the Commissioner's decision to reject the examining physician's opinion that the claimant was disabled. 753 F.2d at 1456.  Similarly, in *Pitzer*, the Ninth Circuit concluded that the nonexamining doctor's opinion "with nothing more" did not constitute substantial evidence.  908 F.2d at 506 n. 4.

Here, however, the ALJ relied on his review of the objective medical evidence and concluded that Dr. Parry's opinion was "completely inconsistent with her treatments notes, which . . . document relatively minimal examination findings and GAF scores of 60 and 80." (AR at 20.)  This inconsistency within Dr. Parry's own medical reports formed the basis for rejecting Dr. Parry's medical source statement. Therefore, even if the ALJ relied on the opinions of the state agency consultants in discounting Dr. Parry's opinion, it did not form the only basis for discounting Dr. Parry's opinion, and was not error.

## IX.   CONCLUSION

Having reviewed the matter, the undersigned Magistrate Judge recommends that Plaintiff's motion for summary judgment be **GRANTED in part and DENIED in part** and that Commissioner's cross-motion for summary judgment be **GRANTED in part and DENIED in part**.  The Court recommends a limited remand.  On remand to the Social Security Administration, the administrative law judge should conduct further factfinding on the recent decision by the VA and determine whether or not this decision was based on new evidence not previously before the ALJ, and whether or not this information changes the disability determination.

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than **August 12, 2016**, any party to this action may file written objections with the Court and serve a copy to all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **August 19, 2016**.

Dated:  August 5, 2016

Hon. Bernard G. Skomal
United States Magistrate Judge